***EXHIBIT E***

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO. 04 CV 10632 MEL

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MARY B. SMITH,                                              \*

    Plaintiff,                                           \*

                                                \*

vs.                                                          \*

                                                \*

DAVID C. NICHOLSON, TRUSTEE OF THE D.J.J.    \*

REALTY TRUST, DOMINIC M. SAWICKI, TRUSTEE

OF THE DOMINIC M. SAWICKI NOMINEE TRUST,     \*

and CAROL ANN WHITNEY and GLENN WHITNEY,

                                                \*

    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    DEPOSITION OF JOANNE M. NICHOLSON, a witness called on behalf of the Defendants, pursuant to Massachusetts Rules of Civil Procedure, before Patricia A. Arria, a Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Curley & Curley, 27 School Street, Boston, Massachusetts, on Thursday, October 6, 2005 commencing at 4:06 p.m.

36

1  medical bills, that her and Dave would pay them.  That,
2  you know, that was basically the extent of that.  And
3  she had told me that she had seen Mrs. Smith and that
4  she was doing great.
5     Q.  That was subsequent to the fall, she was doing
6  great?
7     A.  Yeah.
8     Q.  Did she ever give you her impression of what she
9  felt about the lawsuit?
10    A.  She didn't think it was right at all.
11    Q.  Did she tell you why she didn't think it was
12 right?
13    A.  She didn't feel it was our fault, that we did
14 anything wrong.
15    Q.  Do you know if she spoke to David Smith about
16 this case at all?
17    A.  Yes.
18    Q.  How do you know that?
19    A.  She said that they have talked about it.
20    Q.  Did she tell you what they talked about?
21    A.  They don't agree on the position.
22    Q.  In what way specifically?
23    A.  Well, she didn't agree with him constantly
24 calling me about it.  She felt that, you know, they were

37

1  responsible for any medical bills if, you know, the town
2  wasn't. And that he had gone golfing that day instead
3  of coming to my mother's funeral and that was the reason
4  why his mother was there to begin with.
5   Q. Did you speak with Paul Marseglia about this?
6   A. Yes.
7   Q. What was the nature of those conversations?
8   A. I lived with him. Crying. Upset. Disbelief.
9  Anger.
10  Q. Do you know if he spoke with David Smith about
11 this accident?
12  A. No. We honestly tried not to have much
13 communications after.
14  Q. Is it fair to say that this incident caused a
15 rift in that relationship?
16  A. Yes.
17  Q. Did you talk to Debra or Kent Seith about the
18 accident?
19  A. Yes.
20  Q. When did you have a discussion about the
21 accident?
22  A. Numerous occasions. After pretty much almost
23 every phone call that Dave gave me, I talked to either
24 Paul or somebody in the family because I was upset.

                                                              38

1    Q.  What is the nature of your conversations with
2    Debra or Kent?
3    A.  Same thing.  Absolute disbelief.  Especially when
4    this lawsuit was posted to my dad's lamppost two days
5    after my mom's anniversary when she died.  It was
6    complete disbelief that this was going forward and --
7    Q.  Had they ever told you that they had witnessed
8    the fall?
9    A.  They had -- what Kent had told me was, they were
10   walking -- he was behind Mrs. Smith and Debbie and that
11   just like an instant before she fell, he recalled
12   thinking, somebody should be holding her hand, and then
13   she fell.  He felt bad because, you know, he had
14   thought.
15   Q.  And did Debbie witness the accident?
16   A.  She was right there.
17   Q.  Did she ever tell you what she witnessed?
18   A.  Just that she couldn't believe it happened.  I
19   mean, I don't know.  She didn't say anything about her
20   falling on a stone or -- the general consensus was she
21   fell, she was hurt.
22   Q.  So nobody -- is it fair to say that nobody who
23   witnessed the accident ever mentioned the existence of
24   any loose rocks or stones as being the cause of the

56

1    A.   I don't know what you mean.  This is a clearer
2  picture and it's a smaller portion of the road.
3    Q.   You're pointing to Exhibit 11 from the Nicholson
4  deposition?
5    A.   Yes.  This seems like a longer shot of the road.
6  Shows more of the road.
7    Q.   Okay.  Well --
8    A.   Into our driveway.
9    Q.   Looking at Exhibit 1 from the Deering deposition,
10  I'd like you to look at the X on the upper portion of
11  the road in that picture of that photograph; do you see
12  that?
13    A.   Yes.
14    Q.   Does that appear to you to be where you found
15  Mrs. Smith when you came out of the house on the date of
16  the accident?
17    A.   It looks about the same, yeah.  It's hard to - if
18  I'm looking at the two pictures, it's hard to tell from
19  the perspective, but from what I would have walked up
20  and found her at, it looks about the same and the
21  artifacts seem about the same.
22    Q.   Thanks.
23         MR. DRAYER:  Do you want to have these
24  remarked or does it matter?

