UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY B. SMITH,<br>Plaintiff | )<br>)<br>)<br>) |
| vs. | ) CIVIL ACTION NO.: 04 CV 10632 MEL<br>) |
| DAVID C. NICHOLSON, TRUSTEE<br>OF THE D.J.J. REALTY TRUST,<br>DOMINIC M. SAWICKI,<br>TRUSTEE OF THE DOMINIC M.<br>SAWICKI NOMINEE TRUST,<br>AND CAROL ANN WHITNEY<br>AND GLENN WHITNEY,<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS, DAVID C. NICHOLSON, TRUSTEE OF THE D.J.J. REALTY TRUST, DOMINIC M. SAWICKI, TRUSTEE OF THE DOMINIC M. SAWICKI NOMINEE TRUST, CAROL ANN WHITNEY AND GLENN WHITNEY'S**
<u>**JOINT MOTION FOR SUMMARY JUDGMENT**</u>

<u>**EXHIBIT 2**</u>

2

1

COMMONWEALTH OF MASSACHUSETTS
           DISTRICT COURT
        No. 04-CV-10632 MF1

-------------------------------------
MARY B. SMITH,                            )
                        Plaintiff,   )
                                          )
        vs.                               )
                                          )
DAVID C. NICHOLSON, TRUSTEE, et al,   )
                                          )
                       Defendants.    )
-------------------------------------

     DEPOSITION OF DEBRA M. SEITH, taken in behalf of the defendant Dominic M. Sawicki, pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before David J. Laplante, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of HQ Global Workplace, 945 Concord Street, Framingham, Massachusetts, on Friday, October 14, 2005, commencing at 1:55 p.m.

LAPLANTE & ASSOCIATES, INC.
(508) 999-7499

15

```
 1   into the driveway area, approximately how many
 2   feet separated you and Mrs. Smith or were you
 3   all walking in parallel lines?
 4        A.   No.  They were in front of us.  I
 5   would say we were probably at the door and
 6   maybe they were where the window is and a
 7   little bit beyond.  They weren't that far
 8   ahead of us.
 9        Q.   For the sake of our transcription,
10   and so the reader would know --
11        A.   I'm sorry.  How many feet is that?
12        Q.   Could you give us an estimate?
13        A.   How many feet is that?  I'd say
14   between -- I'm letting my husband down right
15   now.  I'd say between 12 and 16 feet.  Is that
16   right?
17        Q.   Do you recall having to go back to
18   the car for anything?
19        A.   No.
20        Q.   When you started down the course of
21   the driveway, was the condition of the road
22   obvious to you?
23        A.   Yes.
24        Q.   What was the condition of the road?
```

16

1     A.   I was glad I wasn't wearing heels
2  because it was, you know, not -- gosh, it's so
3  hard to remember.  I don't want to mess this
4  up.  It wasn't like a fully paved driveway.  I
5  really can't remember if it was paved at one
6  time or if it was just a dirt driveway.  I
7  really can't remember.  But I remember
8  thinking, "I'm glad --" I was actually wearing
9  these shoes probably because I have had these
10 forever, so I was actually thinking to myself,
11 "I am glad I'm not wearing heels and I am not
12 carrying the baby.  I don't want to drop these
13 cookies."
14           I tend to fall, I'm one of those
15 people.
16    Q.   You're showing us that you were just
17 wearing rubber-soled shoes?
18    A.   These were them, probably the same
19 ones or they were the same brand.  These are
20 the ones I wear when I'm pregnant or just had
21 a child, so.
22    Q.   Did you notice any loose rocks or
23 gravel in the road or the driveway?
24    A.   I believe like towards the edges

17

1  there definitely was loose rock or gravel.
2  And I was watching my step because, it's
3  mostly because I'm a klutz.  It's not because
4  of anything.  You know, you're going down an
5  incline and I know myself, I watch my step.
6     Q.   It was obvious to you when you
7  started walking down the driveway that these
8  loose rocks and gravel were there, they
9  weren't hidden under anything?
10    A.   No.  It was obvious.  I was already
11 making a mental note not to drop anything.
12    Q.   Did you have any -- strike that.
13         Had you met Mrs. Smith prior to
14 the day of the funeral?
15    A.   Yes.
16    Q.   When had you met her?
17    A.   Well, you probably know the
18 relationships, my mom's boyfriend or partner,
19 whatever, for lack of, they've been together
20 forever now, it's his mom.  So I had met her
21 on various occasions when she would be down
22 the Cape visiting.  Just different, I met her
23 when her husband passed away, at his funeral.
24 I saw her just, I don't remember dates or

                                                              20

1      Q.   And was there a decline from the
2   street where you had parked down towards the
3   Nicholsons' house?
4      A.   Yes.
5      Q.   Did Mrs. Smith fall on that decline?
6      A.   Yes, I think so.
7      Q.   Let me show you a picture.  Do you
8   recognize this road?
9      A.   Could be their driveway, I don't
10  know.  If you showed me four other ones, I
11  wouldn't be able to pick which one it was, but
12  sure, that could be their driveway, if that's
13  what you're telling me.
14     Q.   I'm asking you.
15     A.   I don't recognize it, no.  But their
16  driveway looks similar, whatever.  It looks
17  like something I recall.
18          MS. ROUSSOS:  Let's have this
19  marked as Exhibit 2.
20          (Exhibit No. 2, Photocopy of
21  photograph; so marked.)
22     Q.   Just to clarify.  I understand that
23  your testimony is that you didn't recognize it
24  as the driveway or Olde Lantern Lane.  Do you

22

1    I'm not putting these words into your mouth,
2    if this happened to be a photograph of the
3    decline, could you mark where Mrs. Smith fell?
4        A.   I can do my best guess because it was
5    a long time ago.  And I would think it would
6    have been right.
7        Q.   I'm going to have you put an X where
8    you think it was.
9        A.   I guess around here, but that's
10   really a guess.
11       Q.   A guess?
12       A.   A guess.
13       Q.   That's fair enough.  That's based on
14   your recollection that she fell on the right
15   side of the road as you were descending from
16   where you parked at the Nicholsons; is that
17   correct?
18       A.   Yes.
19       Q.   Could you just sign that for me.
20       A.   Sure.
21       Q.   When Mrs. Smith fell or immediately
22   prior to Mrs. Smith falling, did she say
23   anything or make any comments about the
24   condition of the road?

38

1  Lantern Lane as a driveway.  Is it fair to say
2  that you have seen people actually walk down
3  Olde Lantern Lane before Mrs. Smith fell as
4  well; correct?
5      A.  Just on that day like for the
6  funeral.
7      Q.  So the day of the funeral was the
8  first time you'd seen anybody walk down Olde
9  Lantern Lane?
10     A.  Most likely.  Like I said, I hadn't
11 been there that often, so when we went there
12 we drove and we were just going to see the
13 family who was already in the house.
14     Q.  Was there anything, to your
15 knowledge, that prevented anyone from driving
16 from Olde Homestead down Olde Lantern Lane to
17 the Nicholson home that day.
18     A.  Nothing would have prevented them,
19 except if they didn't want to get blocked in.
20     Q.  There weren't any signs or barricades
21 or anything to prevent them from doing so?
22     A.  No.
23     Q.  I know that you spoke a little bit
24 about what the weather was like that day, but

                                                                    39

1     what were the lighting conditions like on Olde
2     Lantern Lane when you were walking down to the
3     home?
4         A.   Plenty of sunlight.  I don't think we
5     needed any -- there were not lights on.  I
6     don't think there were any lights there.  I'm
7     not sure.  I wouldn't have noticed them unless
8     they were on and they weren't.  We didn't need
9     them.
10        Q.   Was there anything that prevented you
11    from seeing the surface of Olde Lantern Lane
12    as you were walking down towards the Nicholson
13    home?
14        A.   No.
15        Q.   Now, I think that when you were
16    describing how Mrs. Smith fell, you said that
17    her feet went out to the right and her fall
18    was graceful; is that correct?
19        A.   Yes.
20        Q.   Did it look like anyone or anything
21    held her up at all or inhibited her fall in
22    any way?
23        A.   Inhibited her fall?
24        Q.   Yes.

41

```
 1   got there.
 2       A.   We live on a lake, so there are rocks
 3   and gravel everywhere on lake property.  And
 4   this is the Cape, so I assume it's sort of
 5   like that.
 6       Q.   Just naturally occurring?
 7       A.   Naturally occurring.  Or if there,
 8   like where we live, if they had had a road at
 9   one point, it probably wasn't very good and
10   they never put a new one in or something like
11   that, but.
12       Q.   Do you know if anyone other than the
13   friends and family of the Nicholsons ever used
14   Olde Lantern Lane at any time prior to Mrs.
15   Smith falling?
16       A.   If they used it to walk or drive?
17       Q.   Walk or drive?
18       A.   I'm sure people used it to drive on,
19   and most likely to walk because they had dogs.
20   So they probably went for walks with the dogs
21   all the time.
22       Q.   Have you ever seen anyone other than
23   friends or family of the Nicholsons walk their
24   dogs on Olde Lantern Lane?
```