UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARY B. SMITH,<br>    Plaintiff | )<br>)<br>)<br>) | |
| vs. | )<br>) | CIVIL ACTION NO.: 04 CV 10632 MEL |
| DAVID C. NICHOLSON, TRUSTEE<br>OF THE D.J.J. REALTY TRUST,<br>DOMINIC M. SAWICKI,<br>TRUSTEE OF THE DOMINIC M.<br>SAWICKI NOMINEE TRUST,<br>AND CAROL ANN WHITNEY<br>AND GLENN WHITNEY,<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |

**DEFENDANTS, DAVID C. NICHOLSON, TRUSTEE OF THE D.J.J. REALTY TRUST, DOMINIC M. SAWICKI, TRUSTEE OF THE DOMINIC M. SAWICKI NOMINEE TRUST, CAROL ANN WHITNEY AND GLENN WHITNEY'S <u>JOINT MOTION FOR SUMMARY JUDGMENT</u>**

<u>**EXHIBIT 3**</u>

```
                                                         1
       COMMONWEALTH OF MASSACHUSETTS
               DISTRICT COURT
             No. 04-CV-10632 MF1
```

-----------------------------------------

MARY B. SMITH,                                )
                        Plaintiff,            )
                                              )
           vs.                                )
                                              )
DAVID C. NICHOLSON, TRUSTEE, et al,           )
                                              )
                        Defendants.           )

-----------------------------------------

DEPOSITION OF KENT L. SEITH, JR., taken in behalf of the defendant Dominic M. Sawicki, pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before David J. Laplante, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of HQ Global Workplace, 945 Concord Street, Framingham, Massachusetts, on Friday, October 14, 2005, commencing at 11:30 a.m.

**LAPLANTE & ASSOCIATES, INC.**
(508) 999-7499

26

1    Which I conflicted my previous testimony, and
2    I apologize for that, but.
3        Q.   So, just to clarify things, you think
4    now that you parked on Olde Homestead Way, is
5    that correct, and that the driveway was Olde
6    Lantern Lane?
7        A.   I think that's possible.
8        Q.   That's possible.  Fair enough.
9        A.   If I could like go down there, I
10   could verify that in 30 seconds.
11       Q.   Now, let's just refer to it as the
12   driveway.
13       A.   This, Olde Lantern Lane?
14       Q.   Olde Lantern Lane, we are going to be
15   referring to it as the driveway since that's
16   what you had originally called it.
17            Do you recall what the condition
18   of that driveway was?
19       A.   Yes.
20       Q.   Could you tell me about it?
21       A.   Do I have to?  I mean, is it -- okay.
22            It was paved at one point, I
23   believe, because it was rather broken up.
24   Maybe it stopped halfway down.  It was in

27

1   pretty sad shape, I would say. You know, when
2   an old road breaks up and you've got those big
3   clumps of tar that could twist an ankle,
4   whatever. I am -- that's what I remember.
5       Q.  Did you remember seeing that right
6   when you got onto the driveway? Was that
7   obvious right at the beginning of the driveway
8   as you started walking?
9       A.  I don't recall. I know it got worse
10  about halfway through, right about where she
11  was. I can remember, I remember it being
12  decent. I think it was paved, being decent in
13  the beginning, and then getting steadily worse
14  down to the bottom where that landing area is
15  being just dirt.
16      Q.  As you were walking, was it obvious
17  to you that it was getting worse? You could
18  look down and see that was, in your opinion,
19  getting worse?
20      A.  Oh, yes. Oh, yes. I would say that
21  from the top, whatever the top was here, it
22  didn't look perfect. You could tell, I mean,
23  it didn't look, you could tell that it was
24  shady. You could tell that it was sandy and

28

1  turning into dirt and just not a good road
2  from the top.
3            Then it became really obvious as
4  you started walking, you get off the tar and
5  it's just --
6     Q.  Having been there before, did you
7  know that you could drive down that driveway
8  to get to the Nicholsons' house?
9     A.  Yes.  Yes.  Well, you know, it's a
10 funeral.  We figured there was going to be a
11 ton of people.  Like I said before, we didn't
12 want to do that.  I figured it was an option.
13    Q.  Okay.  And as you said, there were no
14 cars parked on that driveway at the time you
15 were walking; is that correct?
16    A.  I don't believe so.
17    Q.  Okay.  Now, I believe you said Mrs.
18 Smith was walking with your daughter Riley --
19    A.  Yes.
20    Q.  -- and Mrs. Dayton; is that correct?
21    A.  Yes.
22    Q.  Prior to, immediately prior to Mrs.
23 Smith's fall, do you recall where in the road
24 Mrs. Smith was in terms of whether she was to

30

1    Q.   Could you tell me about that?

2    A.   It starts off pretty, as I recall, it
3   starts off pretty level and then gradually
4   goes down. And then by the end, it's pretty
5   steep. And then you get to what I call a
6   little landing. I think they've got a boat
7   parked up there which has probably never seen
8   water in ten years.

9          And from there, it gets really
10  steep. I would say where she fell was just
11  starting to get steep. It was not steep yet.

12   Q.   When --

13   A.   Not very steep yet.

14   Q.   Where you're saying it was just
15  starting to get very steep, do you mean the
16  first part of the driveway where it gets,
17  where you said -- strike that.

18          I think you just said the first
19  part of the driveway starts to become steep
20  and then you go down to the Nicholsons'
21  property and there is an another steep hill to
22  the house; is that correct?

23   A.   Can I rephrase?

24   Q.   Sure.