UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY B. SMITH,<br>    Plaintiff | )<br>)<br>)<br>) |
| vs. | )   CIVIL ACTION NO.: 04 CV 10632 MEL<br>) |
| DAVID C. NICHOLSON, TRUSTEE<br>OF THE D.J.J. REALTY TRUST,<br>DOMINIC M. SAWICKI,<br>TRUSTEE OF THE DOMINIC M.<br>SAWICKI NOMINEE TRUST,<br>AND CAROL ANN WHITNEY<br>AND GLENN WHITNEY,<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS, DAVID C. NICHOLSON, TRUSTEE OF THE D.J.J. REALTY TRUST, DOMINIC M. SAWICKI, TRUSTEE OF THE DOMINIC M. SAWICKI NOMINEE TRUST, CAROL ANN WHITNEY AND GLENN WHITNEY'S**
<u>**JOINT MOTION FOR SUMMARY JUDGMENT**</u>

<u>**EXHIBIT 3**</u>

31

1   A.  It's a gradual steep, gradual
2   decline, I guess, down to that first landing.
3   It is a little steeper at the bottom of that
4   towards that landing. And from there down to
5   the second area where the dogs, I mean the
6   house is, at least the garage and everything,
7   it's really steep.
8       Q.  And is it your testimony that Mrs.
9   Smith fell on this area where it was a gradual
10  decline?
11      A.  Yes, definitely.
12      Q.  And do you recall if the decline had
13  already started when she had fallen?
14      A.  Yes, I would say it did.
15      Q.  Do you know about how many feet past
16  sort of the crest of the hill before it
17  declines she fell?
18      A.  No. I could never make that call
19  because it's so gradual. I don't know what
20  would be the start of it. I mean from, I
21  guess from the very top of that driveway, it
22  starts to get gradual, but it's not bad in the
23  beginning and then kind of, as I recall. I
24  would love to walk the property again.

39

1   Q.   Could you describe to me how she
2   fell?
3   A.   Sure.  She, it seems to me like her
4   left foot, perhaps one of her feet literally
5   rolled out from under her as if she had
6   stepped on a gravel rock of some sort and she
7   fell not too hard.  I remember thinking oh,
8   she might be okay.  But, of course, given her
9   age, no fall is going to be, probably going to
10  be okay.
11          But it wasn't, it kind of looked
12  liked like her feet just went out from under
13  her.  It didn't look like she tripped over a
14  branch or tripped over someone's leg.  It
15  looked like her feet just went out from under
16  her, as if she had stepped on a bowling ball
17  and it just went out.
18          And she fell to her left, I think.
19  My wife and I disagree on that one, too, but I
20  can remember -- although, yes.
21  Q.   And you were standing behind her, so
22  from your point of view she had fallen to her
23  left side; is that correct?
24  A.   Yes.

44

1   while she was still on the ground, as to what
2   she may have fallen over?
3       A.  I don't think so, not that I
4   remember.
5       Q.  When you approached the situation and
6   Mrs. Smith, did you happen to look around to
7   see if maybe Mrs. Smith fell on anything?
8       A.  I think I might, I was aware of the
9   surroundings.  I was aware of the situation.
10  She was in a particularly rocky section, but
11  then again, that's like I said earlier, that's
12  why I was concerned anyways.
13          You know, we were approaching the,
14  one of the sections where it's all broken up
15  on the right side.
16      Q.  So it was obvious to you before you
17  were approaching it that it was a broken-up
18  and rocky section?
19      A.  Yes.
20      Q.  You didn't see any particular rock or
21  gravel that Mrs. Smith might have fallen over
22  or on?
23      A.  No.  I don't remember the exact
24  piece.  There was not a big giant piece or

LAPLANTE & ASSOCIATES, INC.
(508) 999-7499

45

1    bowling-ball size piece.

2    Q.  Do you recall if the EMTs approached
3    the scene at that point in time?

4    A.  It was a while afterwards. I was
5    inside. So I mean, I think I might have
6    glanced out and they were there. We all
7    rushed up to see if we could help and then
8    someone went inside, might have been me, I
9    forget, someone went inside and said, "We have
10    to call an ambulance."

11    They called an ambulance, and I
12    went inside myself because there was nothing I
13    could do. And I pretty much lost track of the
14    scene. I think I looked out and there was
15    paramedics with the stretcher thing or the
16    ambulance, I think, backed right up to it.

17    But either way, I was not really
18    there when it came. That was a good 15
19    minutes afterwards.

20    Q.  Okay. So you were not actually on
21    the scene when the ambulance came; is that
22    correct?

23    A.  Correct.

24    Q.  Could you see the ambulance from the

54

```
1    on the roadway?
2       A.   No, I don't think so.
3       Q.   I think you had testified earlier
4    that it was quite obvious to you as to the
5    condition of the road or driveway; is that
6    correct?
7       A.   Yes.
8            MS. HANNIGAN:  I have nothing
9    further for now.  Thank you.
10
11
12
13   EXAMINATION BY MR. FOX:
14      Q.   My name is Bruce Fox and I represent
15   Carolyn and Bruce Whitney who are also
16   property owners who have been sued in this
17   case as well.
18           Just a couple of questions.  First
19   of all, are you here today because you
20   received a subpoena to come and testify?
21      A.   Oh, yes.
22      Q.   And, sir, what is your date of birth?
23      A.   8/1/71.
24      Q.   And once you got the subpoena and in
```