Exhibit 9
Smith v. Nicholson, et al.
Civil Action No.: 04 CV 10632 MEL

**Priscilla D. WEBSTER**

v.

**BLUE SHIP TEA ROOM, INC.**

Supreme Judicial Court of Massachusetts.

Suffolk.

Argued April 6, 1964.

Decided May 4, 1964.

Action to recover for personal injuries sustained by reason of alleged breach of implied warranty of merchantability of food served by defendant in its restaurant. The defendant excepted to the refusal of the trial judge to allow certain motions including one to direct a verdict in its favor after a verdict for the plaintiff. The Supreme Judicial Court, Reardon, J., held that no chef is forced to reduce pieces of fish in chowder to miniscule size in an effort to ascertain if they contain any pieces of bone, and a fish bone lurking in fish chowder, about the ingredients of which there is no other complaint, does not constitute a breach of implied warranty under Uniform Commercial Code.

Exceptions sustained. Judgment for defendant.

**Food ⇐25**
**Sales ⇐284(1)**

No chef is forced to reduce pieces of fish in chowder to miniscule size in an effort to ascertain if they contain any pieces of bone, and a fish bone lurking in fish chowder, about the ingredients of which there is no other complaint, does not constitute a breach of implied warranty under Uniform Commercial Code. M.G.L.A. c. 106 §§ 2-314(1), (2) (c); 2-316 (3) (b).

---

John J. C. Herlihy, Neil L. Lynch, Boston, for defendant.

Blair L. Perry, Boston, for plaintiff.

Before WILKINS, C. J., and SPALDING, WHITTEMORE, CUTTER and REARDON, JJ.

REARDON, Justice.

This is a case which by its nature evokes earnest study not only of the law but also of the culinary traditions of the Commonwealth which bear so heavily upon its outcome. It is an action to recover damages for personal injuries sustained by reason of a breach of implied warranty of food served by the defendant in its restaurant. An auditor, whose findings of fact were not to be final, found for the plaintiff. On a retrial in the Superior Court before a judge and jury, in which the plaintiff testified, the jury returned a verdict for her. The defendant is here on exceptions to the refusal of the judge (1) to strike certain portions of the auditor's report, (2) to direct a verdict for the defendant, and (3) to allow the defendant's motion for the entry of a verdict in its favor under leave reserved.

The jury could have found the following facts: On Saturday, April 25, 1959, about 1 P. M., the plaintiff, accompanied by her sister and her aunt, entered the Blue Ship Tea Room operated by the defendant. The group was seated at a table and supplied with menus.

This restaurant, which the plaintiff characterized as "quaint," was located in Boston "on the third floor of an old building on T Wharf which overlooks the ocean."

The plaintiff, who had been born and brought up in New England (a fact of some consequence), ordered clam chowder and crabmeat salad. Within a few minutes she received tidings to the effect that "there was no more clam chowder," whereupon she ordered a cup of fish chowder. Presently, there was set before her "a small bowl of fish chowder." She had previously enjoyed a breakfast about 9 A. M. which had given her no difficulty. "The fish

chowder contained haddock, potatoes, milk, water and seasoning. The chowder was milky in color and not clear. The haddock and potatoes were in chunks" (also a fact of consequence). "She agitated it a little with the spoon and observed that it was a fairly full bowl * * *. It was hot when she got it, but she did not tip it with her spoon because it was hot * * but stirred it in an up and under motion. She denied that she did this because she was looking for something, but it was rather because she wanted an even distribution of fish and potatoes." "She started to eat it, alternating between the chowder and crackers which were on the table with * * * [some] rolls. She ate about 3 or 4 spoonfuls then stopped. She looked at the spoonfuls as she was eating. She saw equal parts of liquid, potato and fish as she spooned it into her mouth. She did not see anything unusual about it. After 3 or 4 spoonfuls she was aware that something had lodged in her throat because she couldn't swallow and couldn't clear her throat by gulping and she could feel it." This misadventure led to two esophagoscopies at the Massachusetts General Hospital, in the second of which, on April 27, 1959, a fish bone was found and removed. The sequence of events produced injury to the plaintiff which was not insubstantial.

We must decide whether a fish bone lurking in a fish chowder, about the ingredients of which there is no other complaint, constitutes a breach of implied warranty under applicable provisions of the Uniform Commercial Code,[1] the annotations to which are not helpful on this point. As the judge put it in his charge, "Was the fish chowder fit to be eaten and wholesome? * * * [N]obody is claiming that the fish itself wasn't wholesome. * * But the bone of contention here—I don't mean that for a pun—but was this fish bone a foreign substance that made the fish chowder unwholesome or not fit to be eaten?"

The plaintiff has vigorously reminded us of the high standards imposed by this court where the sale of food is involved (see Flynn v. First Natl. Stores Inc., 296 Mass. 521, 523, 6 N.E.2d 814) and has made reference to cases involving stones in beans (Friend v. Childs Dining Hall Co., 231 Mass. 65, 120 N.E. 407, 5 A.L.R. 1100), trichinae in pork (Holt v. Mann, 294 Mass. 21, 22, 200 N.E. 403), and to certain other cases, here and elsewhere, serving to bolster her contention of breach of warranty.

The defendant asserts that here was a native New Englander eating fish chowder in a "quaint" Boston dining place where she had been before; that "[f]ish chowder, as it is served and enjoyed by New Englanders, is a hearty dish, originally designed to satisfy the appetites of our seamen and fishermen"; that "[t]his court knows well that we are not talking of some insipid broth as is customarily served to convalescents." We are asked to rule in such fashion that no chef is forced "to reduce the pieces of fish in the chowder to miniscule size in an effort to ascertain if they contained any pieces of bone." "In so ruling," we are told (in the defendant's brief), "the court will not only uphold its reputation for legal knowledge and acumen, but will, as loyal sons of Massachusetts, save our world-renowned

---

1. "(1) Unless excluded or modified by section 2-316, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale. (2) Goods to be merchantable must be at least such as * * * (c) are fit for the ordinary purposes for which such goods are used * * *." G.L. c. 106, § 2-314.
"* * * (3) (b) [W]hen the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him * * *." G.L. c. 106, § 2-316.

fish chowder from degenerating into an insipid broth containing the mere essence of its former stature as a culinary masterpiece." Notwithstanding these passionate entreaties we are bound to examine with detachment the nature of fish chowder and what might happen to it under varying interpretations of the Uniform Commercial Code.

Chowder is an ancient dish preëxisting even "the appetites of our seamen and fishermen." It was perhaps the common ancestor of the "more refined cream soups, purées, and bisques." Berolzheimer, The American Woman's Cook Book (Publisher's Guild Inc., New York, 1941) p. 176. The word "chowder" comes from the French "chaudière," meaning a "cauldron" or "pot." "In the fishing villages of Brittany * * * 'faire la chaudière' means to supply a cauldron in which is cooked a mess of fish and biscuit with some savoury condiments, a hodge-podge contributed by the fishermen themselves, each of whom in return receives his share of the prepared dish. The Breton fishermen probably carried the custom to Newfoundland, long famous for its chowder, whence it has spread to Nova Scotia, New Brunswick, and New England." A New English Dictionary (MacMillan and Co., 1893) p. 386. Our literature over the years abounds in references not only to the delights of chowder but also to its manufacture. A namesake of the plaintiff, Daniel Webster, had a recipe for fish chowder which has survived into a number of modern cookbooks [2] and in which the removal of fish bones is not mentioned at all. One old time recipe recited in the New English Dictionary study defines chowder as "A dish made of fresh fish (esp. cod) or clams, stewed with slices of pork or bacon, onions, and biscuit. 'Cider and champagne are sometimes added.'" Hawthorne, in The House of the Seven Gables (Allyn and Bacon, Boston, 1957) p. 8, speaks of "[a] codfish of sixty pounds, caught in the bay, [which] had been dissolved into the rich liquid of a chowder." A chowder variant, cod "Muddle," was made in Plymouth in the 1890s by taking "a three or four pound codfish, head added. Season with salt and pepper and boil in just enough water to keep from burning. When cooked, add milk and piece of butter." [3] The recitation of these ancient formulae suffices to indicate that in the construction of chowders in these parts in other years, worries about fish bones played no role whatsoever. This broad outlook on chowders has persisted in more modern cookbooks. "The chowder of today is much the same as the old chowder * * *." The American Woman's Cook Book, supra, p. 176. The all embracing Fannie Farmer states in a portion of her recipe, fish chowder is made with a "fish skinned, but head and tail left on. Cut off head and tail and remove fish from backbone. Cut fish in 2-inch pieces and set aside. Put head, tail, and backbone broken in pieces, in stewpan; add 2 cups cold water and bring slowly to boiling point * * *." The liquor thus

---

2. "Take a cod of ten pounds, well cleaned, leaving on the skin. Cut into pieces one and a half pounds thick, preserving the head whole. Take one and a half pounds of clear, fat salt pork, cut in thin slices. Do the same with twelve potatoes. Take the largest pot you have. Fry out the pork first, then take out the pieces of pork, leaving in the drippings. Add to that three parts of water, a layer of fish, so as to cover the bottom of the pot; next a layer of potatoes, then two tablespoons of salt, 1 teaspoon of pepper, then the pork, another layer of fish, and the remainder of the potatoes. Fill the pot with water to cover the ingredients. Put over a good fire. Let the chowder boil twenty-five minutes. When this is done have a quart of boiling milk ready, and ten hard crackers split and dipped in cold water. Add milk and crackers. Let the whole boil five minutes. The chowder is then ready to be first-rate if you have followed the directions. An onion may be added if you like the flavor." "This chowder," he adds, "is suitable for a large fishing party." Wolcott, The Yankee Cook Book (Coward-McCann, Inc., New York City, 1939) p. 9.

3. Atwood, Receipts for Cooking Fish (Avery & Doten, Plymouth, 1896) p. 8.

produced from the bones is added to the balance of the chowder. Farmer, The Boston Cooking School Cook Book (Little Brown Co., 1937) p. 166.

Thus, we consider a dish which for many long years, if well made, has been made generally as outlined above. It is not too much to say that a person sitting down in New England to consume a good New England fish chowder embarks on a gustatory adventure which may entail the removal of some fish bones from his bowl as he proceeds. We are not inclined to tamper with age old recipes by any amendment reflecting the plaintiff's view of the effect of the Uniform Commercial Code upon them. We are aware of the heavy body of case law involving foreign substances in food, but we sense a strong distinction between them and those relative to unwholesomeness of the food itself, e. g., tainted mackerel (Smith v. Gerrish, 256 Mass. 183, 152 N.E. 318), and a fish bone in a fish chowder. Certain Massachusetts cooks might cavil at the ingredients contained in the chowder in this case in that it lacked the heartening lift of salt pork. In any event, we consider that the joys of life in New England include the ready availability of fresh fish chowder. We should be prepared to cope with the hazards of fish bones, the occasional presence of which in chowders is, it seems to us, to be anticipated, and which, in the light of a hallowed tradition, do not impair their fitness or merchantability. While we are bouyed up in this conclusion by Shapiro v. Hotel Statler Corp., 132 F.Supp. 891 (S.D.Cal.), in which the bone which afflicted the plaintiff appeared in "Hot Barquette of Seafood Mornay," we know that the United States District Court of Southern California, situated as are we upon a coast, might be expected to share our views. We are most impressed, however, by Allen v. Grafton, 170 Ohio St. 249, 164 N.E.2d 167, where in Ohio, the Midwest, in a case where the plaintiff was injured by a piece of oyster shell in an order of fried oysters, Mr. Justice Taft (now Chief Justice) in a majority opinion held that "the possible presence of a piece of oyster shell in or attached to an oyster is so well known to anyone who eats oysters that we can say as a matter of law that one who eats oysters can reasonably anticipate and guard against eating such a piece of shell * * *." (P. 259 of 170 Ohio St., p. 174 of 164 N.E.2d.)

Thus, while we sympathize with the plaintiff who has suffered a peculiarly New England injury, the order must be

Exceptions sustained.

Judgment for the defendant.