UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARY B. SMITH
      Plaintiff

    v.                                      CIVIL ACTION NO. 04CV10632MEL

DAVID C. NICHOLSON, et al
      Defendants                             February 20, 2007

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION
### TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

Now comes the Plaintiff, Mary B. Smith, and submits the following Memorandum in support of her Opposition to Defendants' Joint Motion for Summary Judgment, pursuant to F.R.C.P., Rule 56. For the convenience of this Honorable Court, the Plaintiff submits the attached Exhibit List, identifying the Exhibits and Pleadings the Plaintiff relies upon in support of her Opposition to Defendants' Joint Motion for Summary Judgment.

STATEMENT OF UNDISPUTED FACTS

The Plaintiff takes issue with many of the "undisputed facts" which the Defendants submitted and relied upon "in support of their Joint Motion for Summary Judgment." For the convenience of the Court, the Plaintiff summarizes the disputed facts contained in the Defendants Statement of Undisputed Facts, as follows;

On April 6, 2002, the Plaintiff, Mary Smith (hereinafter "Plaintiff") alleged that she slipped and fell on loose rocks on a road **(the issue of whether the road, Old Lantern Lane, is paved or dirt is in dispute)** in Harwich, Cape Cod.

The Plaintiff was walking next to her son's girlfriend, Joanne Dayton. **The Plaintiff was not holding the hand of Joanne Dayton's 3-year-old daughter) (the issue of whether the Plaintiff was holding the hand of Joanne Dayton's 3-year-old granddaughter is in dispute).**

The Defendants stated "**The Plaintiff did not fall in any of the washed out areas and stated that it was the rock on the dirt road that she stepped on that caused her to fall.** Nothing could be further from her sworn testimony. The Plaintiff never referred to Old Lantern Lane as a "dirt" road. What she did testify to was " *I can tell you in the beginning of the road was macadam, was asphalt, beginning of the hill as you came down on it. It wasn't until you got, oh, two-thirds of the way down that it apparently washed out and there was I would think a truck load of rock had been dumped in there, large rock, half the size of my fist. I mean it wasn't just gravel like we refer to gravel. It was large rock and that had been apparently it was a washout and those rocks had been dumped in there to the lower half of the road..*"
See Exhibit 1.

For the Defendants to misstate the Plaintiff's sworn testimony, and to put this misinformation in bold letters for emphasis does a great disservice to this Court and this litigation.

The Plaintiff has <u>never</u> referred to the surface, or Old Lantern Lane, as a dirt road. And, she directly testified in her deposition that she had slipped on rocks in a washed out area, where the asphalt ended and was broken and irregular.

*Q. Now in the actual spot where you put your foot down and touched the rock that caused you to fall, was the area under that rock was it part of the washed out area?*
*A. It was. It was.*
*Q. It was the washed out area?*
*A. Yes, it was.*
*Q. How deep was the washed out area in this spot?*
*A. I can't tell you, except that the rocks were big rocks and they enough of them in there to bring it up to where there were pieces of macadam, asphalt, here and there. So it made it kind of level or however they needed to put that number of rocks in there to level it off.*
*Q. Did that washed out area that was filled with rocks did that go across the entire road?*
*A. No. Not entirely, no, because it was washed out in spots and the macadam, the asphalt, was still in spots and that was left. It was just between these spots that the rocks were placed.*
*Q. Was there a portion of Old Lantern Lane where you fell that was still asphalt that hadn't been washed out?*
*A. Oh, yes, from the top down. From the top two-thirds was intact. It was almost a third left of the road was washed out, but not completely. There were spots where it wasn't and there was macadam showing in those spots where it wasn't washed out.*
*Q. I guess that's kind of my question. As you were standing there and you were about to put your foot down where you fell, was there any asphalt either to your left or to your right?*
*A. No. Where I was coming from there was nothing on either side. I stepped on the rocks, that's right.* See Exhibit 2.

And the Plaintiff testified further:

*Q. When the ambulance people arrived and you were sitting there waiting for them, were you sitting on the part that had been washed out, the stone area, or were you - -*
*A. I was sitting on the asphalt area because I had just stepped off of it. I was halfway on it when I fell.* See Exhibit 3.

Plaintiff never testified that as she walked down the **dirt** road she was looking at her feet, carefully walking over the **dirt** road at the time just preceding her fall.

Regarding further facts, which Plaintiff maintains are disputed:

Plaintiff, David C. Nicholson, testified in his sworn deposition that he had repaired the potholes in Old Lantern Lane during the time he lived there.

*Q. Okay, all right. Under the part where it says, "Ownership, Maintenance and Control," this report reads - - prepared by Mr. Salyards on behalf of Provident Mutual - - "Olde Lantern Lane, obviously, is a private way and the insured did contact an asphalt company and had the driveway tarred and asphalted halfway up the lane", is that correct?*
*A. That was after - - that was Fasciglio when he came and did the thing for free.*
*Q. Okay. There was no - - you had not done any either, you know prior to April 6, 2002 –*
*A. Yes. I did co-patch, patching I did - - as the holes would washout, I'd put stones in it, put dirt over it.*
*Q. Okay.*
*A. And I lived on that road for 20 - - I don't know - - how long ago it was - - four years - - so it would be like 16 or 17 years I've lived on it. We go up and down on it all the time.*
*Q. Sure.*
*A. So just general maintenance and comfort, so that you don't jar yourself going over potholes, I'd fill them in.*
*Q. Okay. And you would do that on your own rather than - -*
*A. Yeah, just on my own. I mean, I was using the road.*
See Exhibit 4

And further:

*Q. In the foreground of this picture, there's a washout or a pothole or whatever.*
*Is that, uhm, what you were talking about as far as things that you repaired on the road from time to time to fill in those areas of potholes or washouts?*
*A. Yeah.*

And later:

*Mr. Smith: That's right. And to - - and to say is this represent - - I'm just asking the witness is this representative of, let's say, the washouts or the potholes that you have seen on the road over the years, including, you know both before and after April 6th?*
*The Witness: Yeah.*
See Exhibit 5

Further, in contrast to the representations to this Court by the Defendants, Plaintiff Nicholson has testified, in his sworn deposition, regarding information on stones being on the road, in potholes and washouts because he put the stones there from time to time, identified himself as the person who made these repairs before the date of the Plaintiff's fall, and stated that washouts, potholes and loose stones were a condition of the road during the time he has lived there, in direct contradiction to the representations made to this Court in Defendants' Joint Motion for Summary Judgment.

These matters indicate some of the genuine issues of fact which are in dispute and require a trial on their merits.

Regarding other disagreements Plaintiff has with Defendants **Concise Statement of Undisputed**

**Material Facts**, Plaintiff submits the following information:

10. The plaintiff and Joanne Dayton decided to park on the road above the Nicholson home and walk down Olde Lantern Lane to the Nicholson house. (**Plaintiff's Deposition, Page 35).**

The Plaintiff never testified (nor has anyone else) that she had any part in the decision to park on

Olde Homestead Way. She was merely a passenger in Ms. Dayton's car.

*Q. Did you follow other cars to get there?*
*A. Yes, we did, and because there were so many cars we had to park on the road above their home.*
See Exhibit 6

To add to the testimony of the Plaintiff, quoted by the Defendants, for clarity:

27. The plaintiff did not see the rock that caused her fall, she just felt a rock under her foot. **(Plaintiff's Deposition, pages 44,45)**

*Q. Did you ever see the rock that you fell on?*
*A. No. There were a lot of rocks, big rocks.*
*Q. How do you know it was a rock that you fell on?*
*A. How what?*
*Q. How do you know it was a rock that you fell on?*
*A. Well, there were a lot of them and I just skidded on one of them and fell.*
*Q. Could you feel the rock under your feet?*
*A. Oh, yes. When I went down I knew what had happened.*
See Exhibit 7

Again, for clarity to the Court;

*Q. Did it look as though it was unnatural, it seemed to you that somebody had put them there and didn't seem part of the natural surface?*
*A. Yes, it wasn't part of the surface. I mean it was interrupting the macadam, the asphalt, because there was asphalt around it you know.*
See Exhibit 8.

Regarding the testimony of Debra M. Seith, quoted by the Defendants:

37. As Debra Seith started down the course of **Old Lantern Lane**(not Old Homestead Lane), the condition of the road was obvious to her. **(Deposition of Ms. Seith, page 15)**

Quoted more of her testimony, for clarity:

*Q. What was the condition of the road?*
*A. I was glad I wasn't wearing heels because it was, you know, not - - gosh, it's so hard to remember. I don't want to mess this up. It wasn't like a fully paved driveway. I really can't remember if it was paved at one time or if it was just a dirt driveway. I really can't remember. But I remember thinking, "I'm glad - -" I was actually wearing these shoes probably because I*

*have had these forever, so I was actually thinking to myself, "I am glad I'm not wearing heels and I'm not carrying the baby. I don't want to drop these cookies."*
*I tend to fall, I'm one of those people.*
See Exhibit 9.

And to clarify Ms. Seith's actual testimony:

Mrs. Seith did not testify as noted by Defendants in 44.

*Q. Just naturally occurring?*
*A. Naturally occurring. Or if there, like where we live, if they had had a road at one point, it probably wasn't very good and they never put a new one in or something like that, but.*
See Exhibit 10.

Regarding the testimony of Kent L. Seith quoted by the Defendants:

To quote what Mr. Seith actually testified:

*Q. Olde Lantern Lane, we are going to be referring to it as the driveway since that's what you originally called it.*
*Do you recall what the condition of that driveway was?*
*A. Yes.*
*Q. Could you tell me about it?*
*A. Do I have to? I mean, is it - - okay?*
*It was paved at one point, because it was rather broken up. Maybe it stopped halfway down. It was in pretty sad shape, I would say. You know, when an old road breaks up and you've got those big clumps of tar that could twist an ankle, whatever. I am - - that's what I remember.*
*Q. Do you remember seeing that right when you got onto the driveway? Was that obvious right at the beginning of the driveway as you started walking?*
*A. I don't recall. I know it got worse about halfway through, right about where she was. I can remember, I remember it being decent. I think it was paved, being decent in the beginning, and then getting steadily worse down to the bottom where that landing area is being just dirt.*
See Exhibit 11.

To further quote what Mr. Seith actually testified:

*Q. Now, I believe you said that you actually, prior to Mrs. Smith falling, thought, had a thought; is that correct?*
*A. Yes.*
*Q. Could you tell me again what that thought was?*
*A. I remember thinking that the driveway is a little bit tricky, a little bit uneven. I see potholes here. And I remember thinking she's older and I was a little unsteady on my feet. If I had my girls, I would have held their hands. I thought, boy, she is unsteady because she is much older. And then sure enough, then I think I looked up. As a matter of fact, I remember thinking I'm going to walk up there and help her, which is a silly thought, like I'm like the hero. But I remember thinking I'm going to go up there just to help her out because I'm a little nervous about the situation. And then as I looked up, that's when she fell.*

*Q. Now, did you see how she actually fell?*
*A. Yes.*
*Q. Could you describe to me how she fell?*
*A. Sure. She, it seems to me like her left foot, perhaps one of her feet literally rolled out from under her as if she had stepped on a gravel rock of some sort and she fell not too hard. I remember thinking oh, she might be okay. But, of course, given her age, no fall is going to be, probably going to be okay.*
*But it wasn't, it kind of looked like her feet just went out from under her. It didn't look like she tripped over a branch or tripped over someone's leg. It looked like her feet just went out from under her, as if she had stepped on a bowling ball and it just went out.*
See Exhibit 12.

Further, in response to Defendants Joint Motion and Summary Judgment Standard:

Genuine issue precluding summary judgment is one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovent, would permit a rationale fact finder to resolve the issue in favor of either party. Fed.R.Civ.P 56(c), *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179.

At summary judgment stage, district judge cannot superimpose his own ideas of probability and likelihood, no matter how reasonable, on the fact of record. Fed.R.Civ.P. 56. *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5.

A material fact is one that has the potential to affect the outcome of the suit under applicable law. *Sanchez v. Alvarado,* 101 F.3d 223

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 417 U.S. 317

If that burden is met, the opposing party can avoid summary judgment only by providing supported evidence of disputed material facts that would require a trial. *Id* at 324.

The jurisdiction of this Court is founded on diversity. 28 U.S.C.A.,section 1332(a). Plaintiff, at the time of this fall was a resident of Connecticut. She has subsequently changed her residence to New Hampshire. All Defendants are residents of Massachusetts.

The application of Massachusetts law to this action is appropriate.

GENUINE AND MATERIAL ISSUES IN DISPUTE

The Plaintiff has provided genuine and material issues in dispute appropriate for resolution by a

trier of fact at trial, as follows:

   1. Whether the Plaintiff was an invitee on the date of her fall on the subject premises?
    Note. Even though Defendants agreed to a stipulation that Plaintiff was an invitee, they continue to argue if Plaintiff was lawfully on the property at the time of her fall.

2. As an invitee, what duty of care was she owed by the owners of the subject property?
3. Did Defendants have an obligation to warn visitors of unreasonable dangers?
4. Which of the Defendants is the owner of the property on which the Plaintiff fell, as there is disputed testimony as to the location of her fall?
5. Is Defendant Nicholson, having undertaken to repair defects and irregularities in the road, responsible to complete those repairs to insure that the premises are safe for invitees?
6. Is the material Defendants used to repair Old Lantern Lane foreign to this road?
7. Is Old Lantern Lane a paved or dirt road?
8. Was the condition of the surface of Old Lantern Lane open and obvious to the Plaintiff?
9. Were rocks, washouts and potholes on Old Lantern Lane defects?
10. Were Plaintiff's actions in walking down Old Lantern Lane reasonable?
11. Did Plaintiff assume risks by walking on Old Lantern Lane?

## ARGUMENT

The Plaintiff represents to this Court that there are numerous genuine issues as to material facts which obviate the granting of summary judgment to the Defendants in this action.

On April 6, 2002 the Plaintiff accompanied Joanne Dayton, her oldest son's girlfriend to Defendant Nicholson's wife's funeral. She did this, not only because she was visiting her son and Ms. Dayton, but out of respect for Defendant Nicholson's daughter, Joanne, who had traveled to Connecticut for the funeral of Plaintiff's husband several years earlier.

**(Deposition of Joanne Nicholson)**
See Exhibit 13.

At the church, the attendees were invited back to the Nicholson residence to pay their respects. **(Deposition of Joanne Nicholson)**
See Exhibit 14

The Plaintiff was being driven by Joanne Dayton. When they arrived at the vicinity of Defendant Nicholson's residence they saw that other mourners were parking on Olde Homestead Way and walking down Old Lantern Lane to the residence.

Joanne Dayton made the decision to park with other vehicles on the upper road.
**(Deposition of Joanne Dayton)**
See Exhibit 15.

Defendant Nicholson's residence could not be seen from that point. The Plaintiff had never been to this residence nor on Old Lantern Lane.

While proceeding as an invitee down this unknown road which Plaintiff testified in her deposition was paved for 2/3 of the road, Plaintiff came to the end of the paved portion, on a steep grade with potholes and broken pavement which Defendant Nicholson testified he fixed from time to time during his time there as a resident. ( **Deposition of David Nicholson**) See Previous Exhibits.

Defendant owed Plaintiff, and other invitees, the duty of reasonable care to insure that the premises were in reasonably safe condition and to warn visitors of any unreasonable dangers of which he was aware or reasonably should be aware.

The Plaintiff, was an 83 year old woman, walking down this road for the first time. She had no knowledge of the depth of the potholes or other possible defects in the surface of the road Defendant had lived on this road for twenty+ years, had made repairs to this road and knew of the potholes and washouts that occurred to this road. He traveled the road daily.

Using reasonable care based on the situation she was facing, she attempted to make her way down the remaining road. However, on one of her first steps off of the paved surface, her feet went out from under her due to the rocks in the pothole and she fell, breaking her femur. She was transported by ambulance to Cape Cod Hospital and subsequently to Waterbury (CT) Hospital where she underwent surgery and rehabilitation. She has walked since with a walker or cane, had her mobility severely curtailed, incurred over $50,000 in medical bills, been hospitalized on several occasions for health issues caused by her forced inactivity and has lost her ability to live independently on her own.

The Defendants argue that a rock on a dirt road is not a defect. The Plaintiff argues that a pothole, or a washout, on a paved road, filled with rocks could be a defect and is a genuine

issue of a material fact which must be decided at a trial of these matters.

This was not a natural accumulation of ice and snow (*Sullivan v. Town of Brookline,* 416 Mass. 825). This was not a fish bone in a bowl of fish chowder (*Webster v. Blue Ship Tea Room,* 347 Mass 421). Nor a brick edging covered by leaves (*Greenfield v. Freedman,* 328 Mass. 272).This was a steep private road, partially paved with asphalt, with potholes and washouts filled with rocks.

Defendants state that under Massachusetts law, a party who falls on a defendant's premises may bring a claim for damages where the condition or substance that caused the fall is foreign to the area. This is clearly a genuine issue of a material fact to be decided by a trier of fact as the Plaintiff testified that she fell at the end of a paved area on a pothole or washout filled with rocks. Plaintiff argues that rocks, such as those used by Defendant Nicholson to fill or repair potholes on the road, are foreign to a paved asphalt surface.

Defendants also specify that there are only three specific legal theories where Massachusetts courts recognize that liability may be imposed on a property owner for a slip and fall accident. The Plaintiff argues that the facts in this case satisfy all three criteria.

1. Defendant Nicholson testified (see attached exhibits) that he placed rocks and stones in potholes or washouts periodically during his time living at his residence.

2. Defendant Nicholson certainly has knowledge of the presence of these rocks and stones on the road, having placed them there, at least in the potholes and washouts.

3. Defendant Nicholson traveled Old Lantern Lane daily, as it is the only access to his residence. He certainly had reasonable opportunity to discover and remedy the condition.

It is more than speculation that Defendant, having placed the rocks and stones in the potholes and washouts on Old Lantern Lane, having testified to doing these repairs "so you don't jar yourself going over potholes, I'd fill them in", raises genuine issue of material facts worthy

of judicial consideration.

The Defendants claim that they owed no duty to the Plaintiff as the condition that caused her fall was open and obvious. While Plaintiff testified that she saw the surface of the road, including where the asphalt ended in patches of rocks and asphalt, it certainly was not obvious to a 83 year old, first time visitor to these premises, how deep these patches of rock and asphalt were, that the rocks would give way under her foot as she stepped from the paved area of the road and this also raises a genuine issue of material fact requiring judicial consideration.

The Defendants represent that Plaintiff had the option to be driven down the road by Joanne Dayton and dropped off at the Nicholson home. Ms. Dayton, in her testimony, having been to the Nicholson residence several times prior, knowing the limited parking at the Nicholson residence and, seeing other parking on Olde Homestead Way, assumed there was no place to park down Old Lantern Lane. So that option was not made available to the Plaintiff.

## CONCLUSION

In hindsight, several people stated they wish the Plaintiff had been driven to the residence. The Plaintiff would not have lost her mobility, endured pain and suffering, incurred extensive medical bills, suffered other health issues brought on by her forced inactivity, and would still be the energetic and active person she was prior to her fall on April 6, 2002.

**"very lively woman"** per Debra Seith in her deposition,
See Exhibit 16.

**"full of energy"** per Kent Seith in his deposition,
See Exhibit 17.

**"She was very dedicated to walking as much as she could"** per Joanne Dayton in her deposition.
See Exhibit 18.

gardening, walking several miles daily and living independently. In hindsight, the

Defendants probably wish they had done more to maintain Old Lantern Lane in a safe

condition, or warn visitors of the unsafe conditions. But that didn't happen.

Wherefore, for the reasons stated herein, the genuine issues of material facts

outlined for this Court, the Plaintiff respectfully requests this Court deny the Defendants

Joint Motion for Summary Judgment and set this matter on the Trial List.

**Dated:  February 20, 2007**                    **THE PLAINTIFF**
                                                 **MARY B. SMITH,**


                                                 **By /s/ Alfred J. Smith, Jr.**
                                                 **Alfred J. Smith, Jr., Esq.**
                                                 **BBO# 467700**
                                                 **706 Bedford Street**
                                                 **Stamford, CT 06901**
                                                 **(203) 359-3200**
                                                 **Email: ajslaw706@aol.com**